IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GRUPO INTERNACIONAL CANTABRIA )
CO., S.A., a Panamanian corporation; VICTOR )
CHACON, RAFAEL CHACON; and )
INVERSIONES VILLAS DE CANTABRIA, S.A., )
a Guatemalan corporation, )
                                                            Plaintiffs, )
                                                            ) No. 07 C 1574
        v. )
                                                            ) Judge Robert W. Gettleman
ABN AMRO INCORPORATED, f/k/a ABN )
AMRO CHICAGO CORPORATION, a New York )
corporation; and UBS AMERICAS )
INCORPORATED, a Delaware corporation, )
                                                            Defendants. )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Grupo Internacional Cantabria Co., S.A. ("Grupo"), Victor Chacon ("Victor"), Rafael Chacon ("Rafael"), and Inversiones Villas de Cantabria, S.A. ("Inversiones"), brought an eight-count complaint against defendants ABN AMRO Inc., f/k/a ABN AMRO Chicago Corp. ("ABN") and UBS Americas Inc. ("UBS")[1] regarding an investment fund that the parties had planned to launch as a joint venture. The complaint alleges: breach of oral contract[2] (Counts I and V); promissory estoppel (Counts II and VI); equitable estoppel (Counts III and VII); and fraud (Counts IV and VIII). Defendants have brought a motion to dismiss the complaint

---

[1]Plaintiffs brought claims against defendant UBS as a successor in interest to defendant ABN.

[2]The complaint labels Counts I and V as "breach of contract," but plaintiffs' response to defendants' motion to dismiss clarifies that the complaint refers only to an oral contract.

pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, the court grants defendants' motion.

# FACTS[3]

Plaintiffs Victor and Rafael Chacon are the president and vice-president, respectively, of Grupo, an investment banking and real estate development company located in Panama. In September 1996, Victor met with Eric Nadelberg ("Nadelberg"), a Vice-President of the Chicago Corporation (later acquired by defendant ABN), to discuss the prospect of offering investment banking services in Central America. According to plaintiffs, Nadelberg represented to Victor that the Chicago Corporation had a "stellar reputation" and "vast resources and global contacts."

In January 1997, Victor met with Nadelberg in Chicago to discuss Victor becoming the exclusive agent for the Chicago Corporation in Central America. In September 1997, Nadelberg went to Guatemala to discuss the creation of a structured note product that Grupo and the Chicago Corporation would launch together. At that time, Nadelberg and Victor made a presentation to several potential clients regarding that structured note product, later called the Lighthouse Fund. Nadelberg told the prospective clients that the product would be ready for purchase and investment in the near future, and that plaintiff Grupo would receive commissions for the sale of its shares.

In November 1997, Victor traveled to El Salvador to make a presentation to officers of Banco Agricola Comercial ("BAC") about the Lighthouse Fund. Victor represented to BAC that

---

[3]For the purposes of a motion to dismiss, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

the fund would be available within several months. By January 1998, Victor had met with several other prospective clients regarding the Lighthouse Fund. Victor and Nadelberg then met with those potential investors together, along with plaintiff Rafael, and informed them that the Lighthouse Fund would be ready in approximately four and a half months. In May 1998, Rafael and Victor traveled to Costa Rica for the inauguration of the new president; at that time, they met with members of the new Costa Rican cabinet and other financial institutions to discuss potential investment in the Lighthouse Fund.

In June 1998, Victor and Rafael went to Chicago to meet with Nadelberg and Roxanne Bennett ("Bennett"), another Vice-President of ABN and Product Developer of the Lighthouse Fund, to discuss the venture. Also present was James Gary ("Gary"), Executive Vice-President of ABN in charge of futures. At that meeting, they discussed that plaintiff Grupo would receive a 1% up-front commission for sales of the product, along with an annual commission of 1.5% of the value of all outstanding shares. Gary concluded the meeting by stating, in reference to the Lighthouse Fund, "This is going to happen."

On February 3, 1999, Victor sent Bob Gaffney ("Gaffney"), Senior Vice-President of ABN, a letter expressing plaintiffs' concern that there was a lack of communication from ABN. Gaffney reassured Victor that ABN would communicate more frequently and in a more timely manner. On September 30, 1999, Victor sent ABN a confidential list of prospective Lighthouse Fund clients located in the United States, Panama, Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica.

On July 25, 2000, Bennett told Victor and Rafael that ABN's Risk Management Committee had approved the Lighthouse Fund. On February 20, 2001, Bennett provided Victor

3

with a draft Offering Memorandum for the Lighthouse Fund. The offering was structured to raise $100 million in capital; it had an initial launch date of April 1, 2001 and required a minimum subscription of $500,000. ABN did not launch the fund on April 1, but in April 2001 Bennett faxed "burn ratios," or performance models, to Victor and Rafael. Those burn ratios projected fees, costs, performance expectations, and the commissions to be paid to Grupo, as well as a quote of $50 million as the initial investment from Rafael and Victor's clients.

On August 14, 2001, Bennett assured Victor that ABN still intended to launch the fund. On November 9, 2001, Bennett sent Victor an updated and revised Offering Memorandum, along with a professionally designed cover proof for the Lighthouse Fund. On February 12, 2002, Bennett e-mailed Victor, "Our goals remain the same: LAUNCH THE FUND." On March 28, 2002, Bennett e-mailed Victor that the fund was "an important piece of our business and we will launch it for ALL our sakes." On May 23, 2002, Bennett e-mailed Victor to inform him that ABN's counsel was completing a final review of the prospectus and that she was finalizing the marketing materials.

On August 14, 2002, Bennett sent Victor an updated version of the fund prospectus and advised Victor that "ABN will make a substantial investment in the Lighthouse Fund." She also told Victor that ABN was "incorporating in the Cayman Islands so that the companies are all set up." Bennett informed Victor that ABN had completed due diligence on the portfolio accounting and risk management aspects of the fund.

On September 4, 2002, Bennett mailed Victor the Lighthouse Fund brochure. On September 9, 2002, Bennett e-mailed Victor that the company was incorporated in the Cayman Islands as Lighthouse Global Fund, Ltd. On October 22, 2002, Bennett e-mailed Victor that the

4

marketing materials were at the printer and would be available in two weeks. She closed the e-mail with "Yes, we are weeks away from launch."

On December 10, 2002, Bennett, on behalf of ABN, and Victor, on behalf of Grupo, executed a Selling Agreement. In that agreement, ABN agreed, through Lighthouse Global, to pay Grupo up to 1.25% of the subscription price of each share it sold as the Selling Agent, as well as 1.5% per year of the month-end net asset value of the shares Grupo sold as the Selling Agent. Also on December 10, 2002, Bennett and Gaffney set a new launch date of January 15, 2003, in the presence of plaintiffs Victor and Rafael and their attorney, Alan Johnson. Bennett and Gaffney told them they could begin receiving capital from their clients for the Lighthouse Fund, although the money would have to be escrowed until January 15, 2003.

On December 18, 2002, Victor and Rafael asked Bennett to contact Mike Conway ("Conway"), Senior Investment Officer for AON Corporation, who had expressed interest in investing in the Lighthouse Fund. Victor and Rafael sent six e-mails to Bennett asking her to contact Conway, but she never did so.

On February 19, 2003, Bennett told Victor that she was completing a PowerPoint sales presentation for the Lighthouse Fund and was securing final product approval from the traders. She also sent Victor an e-mail on that day stating that she was working on the fund and would give Victor and Rafael a firm date on which she would travel to Central America to visit clients. After that e-mail, plaintiffs Victor and Rafael never heard from Bennett again.

According to plaintiffs, ABN never offered for sale or actually sold any shares of the Lighthouse Fund. Plaintiffs estimate that had the Lighthouse Fund been timely launched, plaintiff Grupo would have grossed in commissions a total of $8.75 million.

5

**DISCUSSION**

Defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). Federal notice pleading "requires 'only a short and plain statement of the claim showing that the pleader is entitled to relief.'" Erickson v. Pardus, – S.Ct. –, 2007 WL 1582936 (June 4, 2007) (citing Bell Atlantic Corp. v. Twombley, 127 S.Ct. 1955, 1964 (2007). When ruling on a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Moranski v. General Motors Corp., 433 F.3d 537, 539 (7th Cir. 2005). "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic, 127 S.Ct. at 1964-65.

Counts I and V: Breach of Contract

Counts I and V of the complaint allege that defendant ABN and its successor-in-interest, UBS, breached an oral contract with plaintiffs. Under Illinois law,[4] to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a valid contract; 2) defendants' breach of that contract; (3) plaintiffs' performance under that contract; and (4) damages to plaintiffs resulting from the breach. Donnelli v. Peters Sec. Co., 2002 WL 2003217, *4 (N.D. Ill. Aug. 29, 2002). It is also well-established Illinois law, however, that "[c]ontracts of indefinite duration are

---

[4]Because the parties have not raised a choice of law issue and rely on Illinois law in their briefs, the court will apply Illinois law. Wood v. Mid-Valley, Inc., 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").

terminable at the will of either party." Id., quoting Jespersen v. Minnesota Mining and Manufacturing Co., 700 N.E.2d 1014, 1016 (Ill. 1998).

In the instant case, plaintiffs allege that they formed an oral contract with defendants that: "ABN would develop the infrastructure for the Lighthouse Fund, including, but not limited to, formulating the pricing structure, conduct[ing] the initial marketing of the fund, insur[ing] that all legal requirements would be satisfied, sell[ing] shares in the Lighthouse Fund, and would pay [sic] Grupo Cantabria an up-front sales commission and an annual trailing sales commission." At no point do plaintiff allege that the contract had any term of duration.[5] Plaintiffs attempt to argue that the oral contract implied both a duration and a provision that the parties could not terminate without cause, but plaintiffs provide no support for either of those assertions. As defendants note, the Selling Agreement noted by plaintiffs states that plaintiff Grupo would act as a Selling Agent for an "indefinite period of time," as well as the fact that plaintiffs would receive "ongoing" selling commissions. Because the oral contract did not contain a duration provision, it was terminable at will.[6]

Additionally, as defendants correctly assert, enforcement of the oral contract is barred by the Illinois Statute of Frauds, 740 ILCS 80/1, which requires that a contract be in writing unless it is capable of being fully performed within one year. See, e.g., Cohn v. Checker Motors Corp.,

---

[5]The court is also unclear as to when the contract began. Defendants seem to believe that the contract was effective as of 1997, but the complaint can be interpreted as saying the contract was effective as late as 2002.

[6]Plaintiffs also argue that the court should apply the "partial performance" exception to the rule that a contract lacking a durational term is terminable at will. Such an exception, however, applies only to parties seeking equitable relief. Rose Importing and Distributing, LLC v. Seesaw, Inc., 2007 WL 551572, *2 (N.D. Ill. Feb. 21, 2007). Because plaintiffs seek money damages, the partial performance exception does not apply in the instant case.

599 N.E. 2d 1112, 1116 (Ill. App. Ct. 1992). Plaintiffs offer three arguments as to why the Statute of Frauds does not apply to the contract in question. First, plaintiffs claim that although the contract itself is oral, the Offering Memorandum of November 9, 2001, and the Selling Agreement are sufficient documentation of the oral contract. To suffice as proof of an oral contract, writings must signed by the parties to be charged under the contract. See, e.g., Geva v. Leo Burnett, Inc., 931 F.2d 1220, 1224 (7th Cir. 1991). Neither of these documents, however, is signed by any defendant,[7] and neither document sets out the terms of the contract as required under Illinois law. See, e.g., Western Metals Co. V. Hartman Ingot Metal Co., 303 Ill. 479, 485 (Ill. 1922) ("the memorandum upon which it is sought to charge a party to a contract must state the contract with such certainty that its essentials can be known from the signed writing, or by some reference contained in the signed writing to some other writing, without recourse to parol proof to supply the essential elements of the contract or to supply the connecting links between the signed writing and some other writing or writings").

Second, plaintiffs argue that enforcement of the contract is not barred by the Statute of Frauds because it was capable of being performed within one year. The very Selling Agreement referenced by plaintiffs, however, refutes this assertion. That agreement states specifically that plaintiff Grupo as selling agent would receive commissions for all outstanding shares. Those shares had to remain outstanding for more than one year. Despite plaintiffs' best assertions, they simply cannot demonstrate that enforcement of the contract is not barred by the Statute of Frauds.

---

[7]Plaintiffs claim that Bennett signed the Selling Agrement, but she did so on behalf of the Lighthouse Fund, not on behalf of defendant ABN.

Finally, plaintiffs argue that the Statute Frauds does not apply because of the "partial performance" exception to the statute. On a basic note, the court is unclear as to when performance would have even begun under the oral contract. Regardless, the partial peformance exception applies only when plaintiffs seek equitable relief. See, e.g., Rose Importing and Distributing, LLC v. Seesaw, Inc., 2007 WL 551572, *2 (N.D. Ill. Feb. 21, 2007). Plaintiffs here seek money damages, so the partial performance exception does not apply. For that reason, along with the others discussed above, the court grants defendants' motion as to Counts I and V.

Counts II and VI: Promissory Estoppel

Counts II and VI allege that defendants made unambiguous promises to plaintiffs that they would offer for sale shares of the Lighthouse Fund and pay plaintiffs an annual sales commission. According to plaintiffs, they reasonably relied on these promises to their detriment. As with plaintiffs' claims for breach of contract, their promissory estoppel claims are barred by the statute of frauds: "the courts of this district and the Seventh Circuit have clarified that the statute of frauds acts as a bar to a promissory estoppel claim." Dumas v. Infinity Broadcasting Corp., 2003 WL 23509644, *9 (N.D. Ill. Dec. 18, 2003), aff'd 416 F.3d 671 (7th Cir. 2005). For that reason, the court grants defendants' motion to dismiss as to Counts II and VI.

Counts IV and VIII: Fraud

Counts IV and VIII allege that defendants defrauded plaintiffs in connection with the establishment of the Lighthouse Fund. Defendants contend that plaintiffs did not allege the counts of fraud with particularity as required by Fed. R. Civ. P. 9(b). Plaintiffs must set out in

9

the complaint "the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 628 (7th Cir. 1990). Despite plaintiffs' assertions, the complaint falls far short of the requirements set out by Fed. R. Civ. P. 9(b). Although plaintiffs set out a number of facts in the complaint, they at no point identify which statements made by defendants were fraudulent or who made the allegedly fraudulent statements. As defendants point out, the words "misstatement," "knowledge," and "intent" are mentioned in the complaint only as conclusory allegations under Count IV and VIII. Such allegations are not stated with the particularity required by Rule 9(b).

Additionally, plaintiffs' fraud claims depend entirely on statements that, when allegedly made, referred only to future actions or events. "A statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation." West v. Western Cas. & Sur. Co., 846 F.2d 387, 393 (7th Cir. 1988). Plaintiffs have made no allegations based on actionable statements or actions by defendants.

Plaintiffs argue that the statements of opinion are actionable because they were made by individuals with "specialized knowledge" of the subject matter in question, which may in some circumstances be considered a statement of fact. See, e.g., id. (when a speaker "holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff, the speaker's opinion becomes in effect an assertion summarizing his knowledge"). Plaintiffs claim that because defendants had specialized knowledge of financial instruments, such as the Lighthouse Fund structured note product, their statements of future actions or events should be construed as fact. What plaintiffs fail to acknowledge, however, is that the alleged

10

statements made by defendants have nothing to do with the structured note product itself, but rather the time at which the product would be offered for sale. Such knowledge is not "specialized" and therefore does not warrant the conversion of statements of future events into statements of present fact. For these reasons, the court grants defendants' motion to dismiss Counts IV and VIII.

Counts III and VII: Equitable Estoppel

Counts III and VII allege that defendants knowingly made misrepresentations or concealed material facts from plaintiffs, and that plaintiffs relied on those misrepresentations or concealed facts to their detriment. As with plaintiffs' claims for fraud, claims for equitable estoppel based on statements of future acts or events are not actionable. See, e.g., Promero, Inc. v. Mammen, 2002 WL 314558970, *9 (N.D. Ill. 2002). For that reason, the court grants defendants' motion to dismiss Counts III and VII.

## CONCLUSION

For the reasons discussed above, the court grants defendants' motion to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

**ENTER: January 11, 2008**

_____
**Robert W. Gettleman
United States District Judge**